Estate of Walter F. Rau, Sr., Deceased, Raymond J. Shorb, Administrator with the Will Annexed v. Commissioner.
Estate of Rau v. Commissioner
Docket No. 61480.
United States Tax Court
T.C. Memo 1959-117; 1959 Tax Ct. Memo LEXIS 130; 18 T.C.M. (CCH) 526; T.C.M. (RIA) 59117; June 8, 1959
*130 Ellsworth T. Simpson, Esq., 1000 Vermont Avenue, N.W., Washington, D.C., for the petitioner. J. Earl Gardner, Esq., and John Schessler, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in tax and additions to tax for fraud, as follows: Additions to
Kind
Tax, Sec. 293(b),
Year
of Tax
Deficiency
I.R.C. 1939
1942
Income
$ 6,230.87
$ 3,115.44
1943
Income and
Victory
37,390.14
25,692.50
1944
Income
32,173.36
17,952.10
1945
Income
45,138.58
22,569.29
1946
Income
10,638.16
5,319.08
1947
Income
17,214.11
8,607.06
By amended answer, the respondent claimed additional deficiencies in tax and additions to tax for fraud, as follows: Additions to
Kind
Tax, Sec. 293(b),
Year
of Tax
Deficiency
I.R.C. 1939
1943
Income and
Victory
$15,523.36
$ 7,761.69
1944
Income
21,551.97
10,775.98
1945
Income
1,154.23
577.12
1946
Income
1,665.56
832.78
The principal issues are (1) whether the taxpayer filed false income tax returns for the years 1942-1947, by knowingly understating receipts and overstating purchases; *131 and (2) whether petitioner is entitled to have the basic deficiencies determined on the basis of a net worth statement rather than on the basis of specific adjustments made by the Commissioner. Findings of Fact Some of the facts have been stipulated and, as stipulated, are incorporated herein by reference. On May 12, 1952, the taxpayer, Walter F. Rau, Sr., was declared incompetent by court order. He died on January 4, 1953; he was then approximately 78 years of age. A bank was appointed executor, but it withdrew, and on March 9, 1955, Raymond J. Shorb was appointed as administrator with the will annexed. Mary Agnes Rau, wife of decedent, died on December 27, 1942; he never remarried. Decedent had no dependents during the taxable years 1942 through 1947. He filed a separate return for 1942 on a community property basis. His individual returns for all the taxable years were filed with the collector of internal revenue at Los Angeles, California. Commencing in 1932, and continuing to August 7, 1947, decedent, as sole proprietor, operated a business known as the Southern Hotel in Bakersfield, California. He owned and operated a business known as the French Cafe, located in the *132 Southern Hotel, from 1934 to May 6, 1946, at which time he formed a partnership with Phil Bender to operate that business. Decedent had a two-thirds interest in the partnership, which was terminated on August 16, 1947. On June 1, 1947, an equal partnership consisting of decedent, Phil Bender, and Robert R. Webb was formed for the purpose of conducting a business also known as the French Cafe, which was located across the street and about a block away from the Southern Hotel. This partnership continued to operate throughout the remainder of the year 1947. From 1934 to August 12, 1947, decedent, as sole proprietor, operated a business known as the Southern Wine and Liquor Store (hereinafter sometimes referred to as the Southern Bar or the Southern Wine and Liquor Bar), located in the Southern Hotel. Beginning in June, 1944, and continuing throughout the years in question, decedent owned and operated the Edmund Hotel in Venice, California. From 1944 to 1947, inclusive, he owned and operated the Sea Spray Hotel in Venice, California. In June, 1946, decedent purchased the Taft Hotel in Taft, California. He owned and operated this hotel together with its restaurant and bar from June 1946 *133 throughout the remainder of the period here involved. The books and records of the French Cafe, Southern Hotel, and the Southern Bar were maintained on the cash basis of accounting under a single entry method of bookkeeping. Decedent made no entries in these books and records. Robert Webb (hereinafter referred to as Webb) was hired as clerk of the Southern Hotel in 1932. In 1934 decedent gave Webb the title of manager. During the years 1942 to 1945 or 1946, Webb's hours of employment were from 7:00 A.M. to 7:00 P.M. In 1945 or 1946, an extra clerk was hired to assist Webb, and thereafter Webb's hours of employment were from 10:00 A.M. to 5:00 P.M. For some years Webb received $100 a month and room and board. In 1945 his salary was raised to $45 a week. During 1940 and 1941 Webb received illegal income in the form of commissions on bets on horse racing using a telephone in the Southern Hotel for this operation. On some days his commission would run as high as $15. Webb did not want to stop this illegal business of taking bets on horse racing, but the business was taken away from him. Webb's hotel duties included hiring and supervising bellboys and maids, keeping order in the *134 hotel, and acting as room clerk. He also, at all times material herein, had charge of the receipts of the French Cafe and Southern Bar. He had nothing to do with the hiring or firing of employees of the French Cafe, Southern Bar, or other business of decedent. Rose Goldstein was employed by the decedent in 1935 as a bookkeeper. She married Jack Longway on July 22, 1942. She kept the books of the Southern Hotel, the French Cafe, and the Southern Bar. Her duties as bookkeeper for the Southern Hotel and the Southern Bar ceased when the Southern Hotel was demolished in August 1947. Her duties as bookkeeper for the French Cafe ceased on May 6, 1946 when decedent formed a partnership with Phil Bender to operate this business. She substituted for Webb when he was on vacation or absent on account of illness. For her services to decedent she received $10 per month, one or two meals a day, and desk space in the lobby of the hotel where she conducted a business of her own. The services Rose Goldstein performed for decedent did not take up much of her time. In her own business she realized income from services rendered as a public stenographer, notary public, mimeographing, telephone answering, *135 and direct mail advertising. She also prepared income tax returns and did some court reporting. After her marriage in 1942 she continued to operate this business under the name of Rose Goldstein. Decedent had bank accounts in the Bank of America National Trust and Savings Association, Bakersfield, California for the French Cafe, Southern Bar, and the Southern Hotel, and also a bank account for the French Cafe in The Anglo California National Bank, Bakersfield, California. He had a personal account and a safety deposit box at the Anglo Bank. Webb was authorized by the decedent to draw checks on the bank accounts of the French Cafe and Southern Bar, and he drew checks on these accounts to meet payroll and other expenses. Webb endorsed the name of decedent on checks drawn by Robert Webb, payable to decedent on the dates and in the amounts set forth in the following schedule: Amount
Date
Check No.
of Check
April 7, 1947
753
$1,000.00
May 2, 1947
806
1,000.00
July 7, 1947
917
3,500.00
June 3, 1946
10
600.00
November 1, 1946
319
1,200.00
Total
$7,300.00
Practically all of the deposits for all of the taxable years to the various bank accounts *136 of decedent's businesses, including those to his personal bank account, were made by Webb in the form of cash and checks. Webb went to the bank every day, sometimes three or four times a day, to make deposits. The amounts deposited as the receipts of the French Cafe and the Southern Bar were entered daily during the years 1942 through 1947 in "year books", consisting of a diary-type volume for each year with a half page or page for each day of the year. Decedent sometimes gave Webb cash and told him to convert the cash into thousand dollar bills. Decedent would put these bills in his safe deposit box at the Anglo Bank. On one occasion when Webb accompanied decedent to the bank, decedent had twenty $1,000 bills when he returned from a visit to the box and bought $20,000 worth of war bonds. Decedent told Webb he made this purchase and Webb saw him make it. Every morning during the years 1942 to May 6, 1946, when Webb reported for work, the steward or the cashier of the French Cafe would bring him a sheet containing figures showing its receipts for the preceding day, the cash register tape, and the cash receipts. The amount of the daily receipts as shown on the cash register tape *137 would be entered at the top of the sheet, and from this amount there would be deducted "payouts" for the expenses of the day. Following instructions received by him from decedent, Webb would deduct and remove from the net receipts of the day thus determined $10 every day of each month and in addition thereto $100, $150 or $200, on Saturdays, Sundays, and holidays. Usually the amount deducted was shown on the daily sheet, but in some instances the deduction made was not reflected on the sheet. The $10 deducted by Webb each day from the net receipts of the French Cafe was placed by Webb in an envelope marked "French Cafe" and this envelope was placed in decedent's safe. Decedent instructed him to do this. At the end of the month the envelope would contain an amount ranging from $280 to $310 depending on the number of days in the month. Webb would then take this amount out of the envelope and give it to decedent, who would have it deposited in his personal bank account, put it in his safe deposit box at the Anglo Bank, or put it in his pocket. When the money was removed, the envelope would be destroyed, and Webb would start the next month with a new envelope. The larger amounts deducted *138 from cash receipts on Saturdays, Sundays and holidays were placed in another envelope marked "French Cafe" and on the outside of this envelope Webb would note the amount deducted and the date of the deduction. Webb would get the receipts of a Saturday, Sunday, or holiday on the morning of the following day, show them to the decedent, and he would tell Webb the amount to be deducted from the receipts in addition to the $10 daily deduction. At times, after deducting the usual $10 from the daily net receipts of the French Cafe or the larger amount on a Saturday, Sunday, or holiday the resulting figure would be below $300. Webb was instructed by decedent in such instances to make out a check payable to cash in an amount which, when added to the receipts as thus reduced, would produce a figure in excess of $300. Such check would be drawn upon the account of the French Cafe, and the proceeds thereof would be added to the receipts. The purpose of adding the proceeds of such check to the receipts, after the $10 or larger deduction had been taken from the actual net receipts, was to make the receipts and deposit for the day "look respectable". Although the addition of the amount of the check *139 to the net receipts for the day increased the receipts and the deposit for that day by that amount, the increase was neutralized for tax purposes by the fact that the amount of the check was falsely entered on the check stub as an expenditure for supplies and was entered on decedent's books as such an expenditure by the bookkeeper. Pursuant to instructions she received from decedent and Webb the amounts of these checks were treated as expenditures for supplies during each of the years 1942, 1943, 1944, 1945, and up to May 6, 1946, even though these amounts did not represent expenditures for supplies. The Southern Bar operated on two shifts, one ending at 4:00 p.m. and the other ending at midnight or 2:00 a.m. Webb would receive the cash receipts from the bar from the day bartender at 4:00 p.m. and from the night bartender the following morning. He would then total the cash receipts for the day, and deduct the amount of "payouts" for expenses. Decedent instructed him to deduct and remove each day from the net receipts thus determined the amount of $25 and he followed these instructions. Webb put the $25 daily withdrawal in an envelope marked "Bar" which was placed in the safe. Decedent *140 also instructed him to deduct an additional larger amount on Saturdays, Sundays and holidays. This amount was usually $100, but when the receipts were exceptionally large, the amount was $150 or $200. Decedent decided how much would be "taken off" on such days. The larger amounts thus deducted on weekends and holidays were placed in the comparable envelope for similar deductions made on such days from the receipts of the French Cafe. When decedent was absent, Webb would deduct $100 but would save the cash register tape for decedent who would examine it on his return. The practice of deducting $25 a day started at the beginning of 1942 and continued until a short time before the Southern Bar was closed in August 1947. The practice of deducting additional large amounts on weekends started at the beginning of October 1942 and continued at least through July 1947. When Webb was absent on leave or because of illness, Rose Goldstein handled the receipts of the French Cafe and Southern Bar. On these occasions the same deductions were taken from the daily and weekend receipts of these businesses that were taken by Webb when he was present. Decedent told her the amounts to be taken as deductions *141 from the daily and weekend receipts. Every day, except when he was absent, Webb recorded the daily receipts of the French Cafe and the Southern Bar in "year books" during the years 1942 through August 10, 1947. When he was absent, Rose Goldstein recorded the receipts from 1942 to May 6, 1946 in the case of the French Cafe, and from 1942 to August 10, 1947 in the case of the Southern Bar. The receipts for the French Cafe recorded in the "year books" were not the actual receipts for the years 1942 to May 6, 1946, inclusive. Disregarding any additions to receipts represented by the proceeds of the foregoing checks payable to cash which were falsely treated as expenditures for supplies and which thus neutralized such additions, the recorded receipts of the French Cafe during that period were understated in the amount of $10 per day on every calendar day and were also understated in addition by at least $100 for each Saturday, Sunday, and holiday. The receipts for the Southern Bar that were recorded in the "year books" were not the actual receipts for the years 1942 to August 10, 1947 inclusive. The recorded receipts were understated in the amount of $25 per day on every calendar *142 day throughout that period and were also understated in addition by at least $100 for each Saturday, Sunday, and holiday from the beginning of October 1942 until at least the end of July 1947. The aggregate of such understatements of receipts from the Southern Bar for 1942 was $12,325. The amounts that were given to Rose Goldstein, and recorded by her in the cash journal as the daily receipts of the French Cafe and the Southern Bar, were the amounts entered daily in the "year books" during the years 1942 to May 6, 1946 in the case of the French Cafe and the amounts entered daily in the "year books" during the years 1942 to August 10, 1947, inclusive, in the case of the Southern Bar. The income tax returns of decedent for 1942 to 1946 inclusive were prepared by Rose Goldstein and she used the checkbooks and the cash journal in preparing these returns. The income tax return of decedent for 1947 was prepared by Emil Reed, and the income of the Southern Bar shown thereon was taken from the cash journal. The income tax returns of decedent for 1942 to 1947 inclusive did not reflect the amounts withheld, and not recorded in the cash journal, from the receipts of the French Cafe and *143 the Southern Bar. Overstatement of Purchases for French Cafe. The receipts that were recorded on the daily sheets of the French Cafe and in the year books were always reduced by amounts actually paid out in cash for supplies and these amounts were frequently characterized as "paid out" or "payouts" on the daily sheets. The cash journal of the French Cafe reflects cash purchases of $17,872.79 for 1943, $24,140.70 for 1944, $1,279.14 for 1945, and $1,969.91 for 1946. The recording in the cash journal of these amounts, which had already been deducted from receipts on the daily sheets, resulted in a duplication and overstatement of cash purchases. In addition to the above mentioned cash purchases, purchases made by check, including the amounts of the fictitious purchases (supra) added to receipts, were recorded in the cash journal. Purchases for the French Cafe are shown in the cash journal in the amount of $48,339.67 for 1943 and in the amount of $45,906.93 for 1944. Purchases for the French Cafe are shown on the individual income tax returns of decedent for 1943 and 1944 in the amount of $66,791.12 for 1943 and in the amount of $55,944.92 for 1944. Purchases for the French Cafe *144 for 1943 and 1944 are substantially overstated in these returns. Inventories. The individual income tax return of decedent for 1943 reflected opening and closing inventories for the French Cafe and for the Southern Bar. Prior to that time inventories were not used to determine income. The individual income tax return of decedent for 1944 reflected an opening and a closing inventory for the Southern Bar. Inventories were not used in subsequent returns to determine income. The decedent's income tax return for 1943 shows an opening inventory for the French Cafe of $3,500 and a closing inventory of $1,050, and an opening inventory for the Southern Bar of $16,452.65 and a closing inventory of $1,695. His income tax return for 1944 shows an opening inventory for the Southern Bar of $1,695 and a closing inventory of $3,050.62. Actual inventories were not kept for the French Cafe and for the Southern Bar for the years 1943 and 1944 and the books and records of the French Cafe and Southern Bar do not reflect that inventories were kept for those years. The inventory figures that were used by the bookkeeper to determine income were given to her by the decedent without any verification. *145 Fraud. The amounts withheld from the gross receipts and not recorded as receipts in the "year books" and cash journal during the years 1942 to May 6, 1946 in the case of the French Cafe and during the years 1942 to August 1947, inclusive, in the case of the Southern Bar, went to the decedent. The amounts that were withheld and not recorded as receipts, that went to decedent from the Southern Bar for the years 1942 to August 10, 1947, inclusive, were withheld with the knowledge, consent and specific instructions, and frequently with the direct participation of the decedent. The amounts that were withheld and not recorded as receipts, that went to decedent from the French Cafe for the years 1942 to May 6, 1946, were withheld with the knowledge, consent and specific instructions and frequently with the direct participation of the decedent. Rose Goldstein was instructed by decedent to show in the cash journal amounts totalling $17,872.79 for 1943, $24,140.70 for 1944, $1,279.14 for 1945, and $1,969.91 for 1946, representing cash purchases of the French Cafe, and these amounts were reflected in purchases when the income tax returns were prepared, even though they had already been *146 subtracted from the receipts of the French Cafe for the years 1943-1946. When the bookkeeper, Rose Goldstein, had the income tax figures made up for 1943, and showed decedent what tax he had to pay, he told her to "boost" the purchases so he would not have much income tax to pay, or none, and she complied with his instructions. When the bookkeeper, Rose Goldstein, had the figures prepared to put in the income tax return for 1944, she showed them to decedent who instructed her to raise the purchases, and she complied with his instructions. Decedent knew that the books and records used to determine income of the French Cafe for the years 1942 to May 6, 1946, and of the Southern Bar for the years 1942 to August 10, 1947 were false and that they did not accurately reflect income. Decedent knew that his individual income tax returns for the years 1942 through 1947 were false and fraudulent and that he had understated his income in substantial amounts for each of the years. Decedent's Health. Decedent habitually used alcoholic beverages and at times drank to excess. During the period August 24, 1942 to September 21, 1945, he visited a doctor at least six times. He was under the *147 influence of alcohol on each of these visits and was brought in or assisted into the doctor's office. During the three years the doctor treated decedent there was a decline in his physical health. The doctor treated him for alcoholic neuritis, arthritis, thrombophlebitis and myocarditis. In the latter part of 1945, decedent was confined to his rooms in the Southern Hotel for a period of three weeks. He employed a practical nurse who cared for him during this period. She remained in his employ until he died. During these three weeks he was in bed most of the time. He had been drinking and not eating. At the end of the three-week period, he had difficulty walking and was in a wheel chair for a short time. Webb was almost a daily visitor to decedent's room during the three-week period. In 1946 decedent and his nurse moved from the hotel to a house which decedent had purchased. Thereafter, until he had a stroke in December of 1947, he visited the hotel practically every day. His nurse would drive his car. He did not stay at the hotel very long during these visits. When the hotel was closed in August 1947, decedent was in the lobby nearly every day until the hotel was demolished. Decedent *148 had trouble with his legs and was required to use a wheel chair in 1947. He was under the care of another doctor from the latter part of 1946 until he died. The doctor treated him for marked phlebitis. The first time this doctor hospitalized decedent was in December 1947 when he had the stroke. At all times material herein, the decedent maintained a close inspection of the books and records of the French Cafe and the Southern Bar, checked on the daily receipts and payouts of these businesses, gave instructions as to the daily and weekend withdrawals from the receipts of these businesses, made it a practice to know everything that was going on, and closely supervised the affairs of these businesses. During the years 1942 through 1946, and until he had a stroke in December 1947, he was mentally alert and had a keen mind in so far as his businesses were concerned. Webb - Bank Accounts and Deposits. Webb had a personal checking account in the Bank of America during the years 1942 through 1947, and maintained a safe deposit box in that bank where he kept cash. He never deposited any of the receipts from the French Cafe or the Southern Bar in his bank account. Among the deposits made *149 by Webb in his personal bank account in the Bank of America during the year 1947 were the following: Date
Amount
May 27, 1947
$1,200.00
May 29, 1947
916.83
May 29, 1947
3,600.00
June 2, 1947
5,000.00
June 13, 1947
1,000.00
Webb was married in 1938. He and his wife lived at the Southern Hotel and received room and board. In 1942 they moved into a completely furnished house owned by decedent which they rented for $40 a month. They had very little expense except the $40 monthly rental since they ate many of their meals at the hotel. From 1938 through 1947 Webb's wife was employed and received a salary of about $150 a month. They tried to save $100 per month and many months they were successful in doing this. They invested some of their savings in war bonds. On or about June 1, 1947, Webb invested $12,000 in the partnership formed to operate the French Cafe. The source of this $12,000 was the proceeds of the sale of war bonds and money in his safe deposit box and in the bank. This money was deposited in the Bank of America, and Webb paid $12,000 for his partnership interest. Bank deposits - Rose Goldstein. Among the deposits made by Rose Goldstein in her *150 personal bank account during the years 1943, 1944, 1945, 1946 and 1947, representing income derived from her business, were the following: Amount
Date
of Deposit
March 9, 1943
$ 946.10
March 19, 1943
468.30
March 17, 1943
1,297.23
September 23, 1943
559.94
July 11, 1944
900.00
March 17, 1945
604.00
January 31, 1946
3,642.88
April 2, 1946
1,000.00
May 9, 1946
1,150.00
June 10, 1946
800.00
June 17, 1946
400.00
September 16, 1946
512.79
September 20, 1946
600.00
October 14, 1946
1,680.00
March 4, 1947
500.00
March 29, 1947
1,902.28
September 19, 1947
2,409.35
August 8, 1947
1,500.00
The total deposits in the personal bank account of Rose Goldstein during the years 1943 through 1947 were as follows: Year
Total Deposits
1943
$ 5,954.68
1944
3,901.15
1945
3,641.74
1946
14,439.85
1947
12,401.86
$40,339.28
Decedent followed a consistent pattern of deliberately understating receipts of the French Cafe for 1942 to May 6, 1946, inclusive, and of the Southern Bar for 1942 to August 10, 1947, inclusive. Decedent deliberately overstated purchases for the French Cafe in 1943, 1944 and 1945, despite repeated *151 objections by his bookkeeper. Decedent caused such books and records as were kept on his behalf to omit specific items of income for the years 1942 to 1947, inclusive, and to overstate specific items that reduced income for the years 1943, 1944 and 1945. Decedent caused false entries to be made in his books and records for the years 1942 to 1947 inclusive. Decedent filed false and fraudulent income tax returns for the taxable years 1942 to 1947 inclusive, and part of the deficiencies for each of these years was due to fraud with intent to evade tax. Opinion RAUM, Judge: The Commissioner made a determination of fraud for each of the years involved, 1942-1947, and we think his proof overwhelmingly establishes fraud. The testimony of Robert Webb and Rose Goldstein was strong and convincing, and was in part corroborated by documentary evidence. Although there may have been minor inconsistencies, the main thrust of their testimony was credible, consistent, powerful, and persuasive. We have no doubt on the evidence that, pursuant to explicit instructions of the decedent, false and fraudulent returns were prepared which understated receipts and overstated purchases. No useful purpose *152 would be served by reviewing the evidence. Our finding of fraud not only lifts the bar of the statute of limitations as to 1942-1944, [1] but also supports the application of Section 293(b), Internal Revenue Code of 1939, with respect to the 50 per cent addition for fraud for each of the years involved. As to the basic deficiencies, the evidence strongly supports the Commissioner's adjustments (including those embodied in his amended answer) as to each item in controversy, except as to the receipts from the Southern Bar for the year 1942, which will be discussed below. Indeed, apart from the year 1942, the evidence would support adjustments of unreported income in excess of those determined by the Commissioner in his notice of deficiency and claimed in his amended answer. [2] Certainly, petitioner has shown no error in the Commissioner's determination, and the Commissioner has fully carried the burden which rests upon him in respect of his allegations in the amended answer. *153 Petitioner contends, however, that income should be determined in accordance with a net worth statement presented to the Court. In the first place, the net worth statement itself shows substantial amounts of unreported income, although less than those determined by the Commissioner's specific adjustments. Moreover, there is no rule of law requiring the use of the net worth method. To be sure, the net worth system is an acceptable method of determining income in the absence of a more precise method. But it may be less reliable than adjustments based upon specific items. See in this respect, Emilie Furnish Funk, 29 T.C. 279, 291-293, affirmed on this issue, 262 Fed. (2d) 727 (C.A. 9). And, on the present record, we are satisfied that the evidence as to specific items furnishes a more accurate guide to the computation of decedent's net income than the net worth statement. As to the year 1942, the record requires a revision of the basic deficiency in one respect, because the evidence as to unreported receipts from the Southern Bar supports the Commissioner's determination only in part. Webb testified that the practice of removing $25 a day from the receipts *154 of the Southern Bar began in the "first part" of 1942 and that the practice of removing the larger amounts ( $100 or more) on weekends and holidays commenced "a few months after the war started". Subsequently, he testified that the practice of removing the larger amounts from the receipts of the Southern Bar began in the "latter part of 1942". Using our best judgment on the evidence we have found that the receipts from the Southern Bar were understated in the amount of $25 a day for each calendar day throughout the year 1942 and were further understated by at least $100 for every Saturday, Sunday, and holiday during the months of October, November and December of 1942. Also, using our best judgment we have found that the aggregate of such understatements of receipts from the Southern Bar was $12,325 for 1942. However, the Commissioner's determination fixes $16,925 as the amount of income from the Southern Bar that was withheld by the taxpayer in 1942 and unreported. Thus, that determination was excessive by $4,600. But, as shown in footnote 2, supra, the Commissioner's adjustment in respect of receipts from the French Cafe in 1942 should have been $2,000 more than it was, with the *155 consequence that the net determination of additional income for 1942 (of the Southern Bar and French Cafe combined) was excessive by $2,600. Accordingly, the deficiency for 1942 should be recomputed so as to take into account the difference of $2,600, which, however, must in turn be reduced by 50 per cent, since the taxpayer filed a separate return for 1942 on a community property basis. Petitioner's brief suggests as an issue herein "the question of the survival of the fraud penalty imposed subsequent to the death of the taxpayer." No such issue was raised in the pleadings, and it is not properly before us. Moreover, petitioner's brief admits that the decisions of the Court on that issue are unfavorable to petitioner, and it presents no argument with respect thereto. Decision will be entered under Rule 50. Footnotes
1. No question as to limitations with respect to the remaining years is presently in issue.↩
2. Thus, the Commissioner added $13,010 to the income of the French Cafe for the years 1942, 1943, and 1945, and $13,020 for 1944. However, based upon the decedent's practice of understating gross receipts by $10 for each calendar day of the year, as well as by at least $100 for each Saturday, Sunday, and holiday, the amount that the Commissioner might have restored to income for each year could have been at least $14,550. The latter figure is based upon 365 calendar days at $10 each, 104 Saturdays and Sundays, and five holidays at $100 each. Moreover, the Commissioner would have been justified in adding further an amount for those days in which more than $100 was withheld from gross receipts by the decedent. Therefore, had the Commissioner increased the adjustment of the income of the French Cafe for each of those years by $2,000, such further adjustment would have been fully supported by the record.↩